RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE  8 / 3 / 11

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| BILLY RAY ROBINSON,<br>    Petitioner | CIVIL ACTION<br>SECTION "P"<br>1:11-CV-00096 |
| VERSUS | |
| STEVE RADER, et al.,<br>    Respondents | JUDGE DEE D. DRELL<br>MAGISTRATE JUDGE JAMES D. KIRK |

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by pro se petitioner Billy Ray Robinson ("Robinson") on January 4, 2011. Robinson is contesting his 2005 convictions and sentences, by a jury in the Louisiana 28th Judicial District Court in LaSalle Parish, Louisiana, on one count of armed robbery and one count of conspiracy to commit armed robbery. Robinson was sentenced to a total of forty years imprisonment.

    Robinson raises the following grounds for habeas relief:

    1. Robinson's constitutional rights were violated when the prosecution allowed its key witness, Eddie Robinson, to testify falsely as to the existence of his agreement with the State, that pending charges against him would be dropped in exchange for his testimony.

    2. Robinson had ineffective assistance of counsel due to (A) counsel's failure to cross-exmaine Eddie Robinson regarding the deal he received in exchange for his testimony against Roginson, (B) counsel's failure to cross-examine Eddie Robinson as to his whereabouts at the time of the bank robbery, and (C) counsel's failure to

subpoena Wal-Mart employee Tina Spears to testify as to the statement she gave to police concerning Eddie Robinson's hairstyle.

3. The evidence does not support the State's contention that it was Robinson and not his brother, Eddie Robinson, who committed the robbery of the Homeland Federal Savings Bank.

Robinson contends he has exhausted his administrative remedies, and the State appears to admit exhaustion. Robinson's petition is now before the court for disposition.

## Rule 8(a) Resolution

This court is able to resolve the merits of this habeas corpus petition without the necessity of an evidentiary hearing because there is no genuine issue of material fact that is relevant to the petitioner's claims, and the State court records provide the required and adequate factual basis necessary to the resolution of the habeas corpus petition. Moya v. Estelle, 696 F.2d 329, 332-33 (5th Cir. 1983); Easter v. Estelle, 609 F.2d 756, 761 (5th Cir. 1980); Habeas Corpus Rule 8(a).

## Standard of Review

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall be considered only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a).

Under 28 U.S.C. § 2254 and AEDPA, which is applicable to habeas petitions filed after its effective date on April 24, 1996,

habeas relief is not available to a state prisoner with respect to a claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim (1) resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an *unreasonable determination* of the facts in light of the evidence presented in the State Court proceeding. Therefore, pure questions of law and mixed questions of law and fact are reviewed under Section 2254 (d)(1), and questions of fact are reviewed under Section 2254(d)(2). <u>Martin v. Cain</u>, 246 F.3d 471, 475-76 (5th Cir. 2001), cert. den., 534 U.S. 885, 122 S.Ct. 194 (2001), and cases cited therein.

### Facts

The facts and evidence in this case, as set forth by the Louisiana Third Circuit Court of Appeal at <u>State v. Robinson</u>, 918 So.2d 1151 (La. App. 3d Cir. 2005), are as follows:

> "Laura Willis, one of the two bank tellers on duty when the robbery occurred, described the robber as a black male with white beads in the bottom of his hair. She stated he was five foot six inches to five foot seven inches tall and wore a white polo-type shirt with a pink ring around the collar and jeans. Ms. Willis could not positively identify the robber because he wore a stocking pulled down over his head and his face just below his nose.
>
> "Jana Hudson, Ms. Willis' co-worker, described the robber as a black male with a stocky build and thick neck who had braids in his hair with beads at the ends. She testified that the robber wore a white polo-style shirt

with a pink stripe on the collar, jeans, tennis shoes, and a black mask. Ms. Hudson also could not positively identify the robber because of the mask he wore.

"Jimmy Arbogast, an investigator with the LaSalle Parish Sheriff's Office, investigated the robbery. He interviewed Ms. Willis and Ms. Hudson to determine the amount of money taken and to get a description of the robber. The bank provided him a list of 'bait money' taken in the robbery. Bait money is a strap of five hundred dollars of twenty dollar bills kept in each teller's drawer. The bills are photocopied, and the serial number of each bill is recorded, so the money can be tracked if the bank is robbed.

"Amanda Smith, accounting manager at the Jena Wal-Mart, testified that on July 24, 2003, she was alerted by a co-employee that someone matching the description of the bank robber was in Wal-Mart. Ms. Smith went to the location identified by her co-employee and followed Eddie Robinson, Defendant's brother, around the store. She notified the LaSalle Parish Sheriff's Department that the bank robber might be present in the store.

"Mr. Arbogast went to Wal-Mart. He matched the serial numbers on money Eddie spent at Wal-Mart to serial numbers of some of the bait money taken from Homeland Bank. Mr. Arbogast was also given three bills spent on July 23, 2003, that matched the serial numbers of the bait money. According to Ms. Smith, the three bills spent on July 23, 2003, were taken from one of the store's front registers. There was no evidence to show what time the money was spent on July 23, 2003.

"Eddie was detained and questioned by police. Subsequently, police searched the residence where he was living. Photographs of Defendant and Eddie, along with a Wal-Mart receipt dated July 23, 2003, at 1:41 p.m., were seized from the residence. Mr. Arbogast testified that as a result of the photographs, Defendant was added as a suspect because Defendant's hair in the photograph taken from the residence matched the robber's hair in photographs taken from bank cameras during the robbery. The receipt was introduced as evidence at the trial, but the photographs were not.

"Eddie testified that he was at home on July 23, 2003, between 12:00 and 1:00 p.m. and that he went to the

neighbor's house between 11:30 a.m. and 12:00 p.m. to borrow a hammer. He later agreed that he went to the neighbor's house between 11:00 and 11:30 a.m. and testified that he was there for fifteen to twenty minutes. Eddie further testified that he paid for the purchase he made on July 24, 2003, with money Defendant had given him the day before 'around twelve.' He testified that he had been convicted of armed robbery in 1988 but denied being involved in the robbery of the Homeland Bank.

"Eddie lived with his mother and her boyfriend, Leslie Wilson. Mr. Wilson testified that he went to the Bank of Jena on July 23, 2003, to cash his social security check and returned home at approximately 10:00 a.m. He further testified that Eddie was home when he returned and that Eddie did not leave home all day, except to borrow a hammer from the neighbor.

"Mr. Wilson testified that he contacted Defendant 'around twelve' on July 23, 2003, and asked Defendant to take him to Wal-Mart. Mr. Wilson testified that he made some purchases and that Defendant got a photograph enlarged while they were at Wal-Mart. Mr. Wilson did not recall what time he talked to Defendant or what time Defendant picked him up, testifying 'I have no direct recollection of the particular time. But, we left from my residence to go to Wal-Mart between twelve and I say, one o'clock.'

"Cheryl Breland, the electronics department manager for Wal-Mart, testified that she was working in the electronics department on July 23, 2003, and assisted a black male enlarging a photograph. While assisting the man, she indicated to him that she recognized him from somewhere, and he explained that she recognized him from Popeye's where he worked. Ms. Breland identified Defendant as the man she assisted. She testified that he wore black pants, a dingy white shirt, and black shoes, one of which had a hole in it. She further testified that he had dread locks in his hair with 'white on the ends of' em.' Ms. Breland stated that Defendant bought a C.D., a calendar, a pair of shoes, two photograph reprints, and possibly a shirt and that he paid for his purchase with twenty dollar bills. She further testified that shortly after she assisted Defendant, Ms. Smith pulled the twenty dollar bills he gave her from her register. Ms. Breland testified that the purchase reflected on the receipt seized from Eddie's residence was [sic] not made at her

register.

"Mr. Arbogast interviewed Defendant after his arrest. Defendant denied going to Wal-Mart on July 23, 2003, and spending money there; he was unable to say where he was at the time of the robbery. He told Mr. Arbogast that he got the money he had from his employer. Mr. Arbogast did not verify this information. Mr. Arbogast searched Defendant's residence but did not find any evidence linking Defendant to the robbery.

"Michael Marcum, Jr., a loss prevention employee of Wal-Mart, reviewed the Jena store security videotapes of July 23 and 24, 2003, and compiled relevant portions on one videotape. He reviewed the tapes based on logs maintained by the person in charge of changing the tapes. Mr. Marcum explained the process he followed to determine the date and time of the excerpts depicted on the tape he prepared. Mr. Marcum testified that a portion of the tape, which depicted a black male in the store, was taped on July 23, 2003, at approximately 1:13 or 1:14 p.m. He further testified that a portion of the videotape, which shows a black male making a purchase, was from July 24, 2003. The videotape was shown to the jury without any testimony identifying the men depicted on the videotape.

"The State also introduced a series of nine photographs of the bank robbery, which depict a black male with white beads at the back of his hair robbing Homeland Bank. The pictures are not clear and would not allow the jury to compare the person depicted in those photographs to Defendant."

Law and Analysis

Eddie Robinson

First, Robinson contends his constitutional rights were violated when the prosecution allowed its key witness, Eddie Robinson, to testify falsely as to the existence of his agreement with the State, that pending charges against him would be dropped in exchange for his testimony; at trial, Eddie denied there was an agreement. Robinson further alleges that his attorney was

ineffective for failing to cross-examine Eddie Robinson regarding the deal he received with the State in exchange for his testimony against Billy Robinson. Finally, Robinson argues that the evidence does not support the State's contention that it was Robinson and not his brother, Eddie Robinson, who committed the robbery of the Homeland Federal Savings Bank.

### 1. Applicable Law

Habeas relief on a claim of insufficient evidence is appropriate only if it is found that, upon the record evidence adduced at trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. West v. Johnson, 92 F.3d 1385 (5th Cir. 1996), cert. den., 520 U.S. 1242, 117 S.Ct. 1847, 137 L.Ed.2d 1050 (1997), citing Jackson v. Virginia, 443 U.S. at 322-26, 99 S.Ct. at 2791-92. To apply this standard, the court looks to elements of the offense as defined by state substantive law. Donahue v. Cain, 231 F.3d 1000, 1004 (5th Cir. 2001). All credibility choices and conflicting inferences are to be resolved in favor of the verdict. A determination of a factual issue made by a State court shall be presumed correct, and the petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. Ramirez v. Dretke, 398 F.2d 691, 693 (5th Cir. 2005).

Under LSA-R.S. 14:64, "[a]rmed robbery is the taking of anything of value belonging to another from the person of another

or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." State v. Williams, 04-697 (5th Cir. 11/30/04), 889 So.2d 1135, 1139. To convict a defendant of armed robbery, the state is required to prove: (1) a taking (2) of anything of value (3) from a person or in the immediate control of another (4) by the use of force or intimidation (5) while armed with a dangerous weapon. La. R.S. 14:64. A dangerous weapon is any instrumentality which, in the manner used, is calculated or likely to produce death or great bodily harm. La. R.S. 14:2(3). State v. Hampton, 38,017 (La.App. 2 Cir. 1/28/04), 865 So.2d 284, 291. In addition to the statutory elements of the charged offense, the state is required to prove the identity of the perpetrator. Where the key issue at trial is identity, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof. Williams, 889 So.2d at 1139, citing State v. Bradley, 03-384, p. 6 (La. App. 5th Cir. 9/16/03), 858 So.2d 80, 85, writ denied, 03-2745 (La.2/13/04), 867 So.2d 688.

To prevail on a habeas complaint of ineffective assistance of counsel a complainant must demonstrate that: (1) his counsel's performance was deficient; and (2) the deficient performance prejudiced his defense. A defendant is prejudiced if there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

To make that determination the court must examine the proceedings as a whole, giving due consideration to the weight of the evidence supporting the verdict and evaluating the alleged failings of counsel in that total setting. The court does not assess any alleged error in isolation. In an examination of state proceedings under 28 U.S.C. § 2254 the court will not reject an adjudication on the merits unless the action by the state court is found to be contrary to, or an unreasonable application of, clearly established federal law, or the state court's determination of the facts is manifestly unreasonable in light of the evidence. Jones v. Cain, 227 F.3d 228, 230 (5th Cir. 2000), and cases cited therein.

To obtain relief on his claim that the state knowingly introduced false testimony, the petitioner bears the burden of establishing that the evidence was false, that the false testimony was material, and that the prosecution offered the testimony knowing it to be false. Chambers v. Johnson, 218 F.3d 360, 363-364 (5th Cir. 2000), citing Giglio v. United States, 405 U.S. 150, 153-154, 92 S.Ct. 763 (1972). The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. Giglio, 405 U.S. at 153, 92 S.Ct. at 766, citing Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173 (1959). Suppression of material evidence justifies new trial irrespective of the good faith or bad faith of the prosecution. Giglio, 405 U.S. at 153, 92 S.Ct. at 766, citing Brady v. Maryland, 373 U.S.

83, 87, 83 S.Ct. 1194, 1197 (1963). When the reliability of a given witness may well be determinative or guilt of innocence, nondisclosure of evidence affecting the credibility falls within this general rule. Giglio, 405 U.S. at 154, 92 S.Ct. at 766, citing Napue, 360 U.S. at 269, 79 S.Ct. at 1177. A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury. Giglio, 405 U.S. at 154, 92 S.Ct. at 766, citing Napue, 360 U.S. at 271, 79 S.Ct. at 1178.

2. Evidence

In the case at bar, the State prosecutor sent the defense attorney a letter dated June 22, 2004, which set forth the State's agreement with Eddie Robinson to dismiss the charges of illegal possession of stolen goods against Robinson if he testified truthfully at Billy Robinson's trial as to how he came into possession of the bait money; that letter was also filed in the record (Doc. 12, Tr. p. 350).

At Billy Robinson's trial, the prosecutor asked Eddie Robinson if he had an agreement with the State to testify at Billy's trial, to which Eddie responded, "No, sir" (Doc. 12, Tr. p. 462). The prosecutor did not further inquire into Billy's response or ask him about their agreement, and the defense did not impeach Eddie with the written evidence of his agreement with the state. Therefore, although the agreement was disclosed to the defendant and the trial judge, the jury (which was the finder of fact in this case) was not

informed of the agreement because Eddie's testimony was not corrected at trial by either attorney.

Billy Robinson contends Eddie's testimony was material because Eddie was the State's key witness. Eddie testified he heard about a bank robbery in Jena on July 23, 2003 from his mother (Doc. 12, Tr. p. 453). Eddie testified that his brother, Billy, had given him $120 on July 23, 2003, and Eddie spent some of it in Wal Mart on July 24, 2003 (Doc. 12, Tr. p. 460). Eddie testified that he was unaware some of the money he spent at Wal Mart was bait money, and he was arrested for possession of stolen goods because of it (Doc. 12, Tr. pp. 461-462). Eddie again testified that he had gotten the bait money from his brother, Billy Robinson (Doc. 12, Tr. p. 462). Eddie further testified that he did not participate in the bank robbery on July 23, 2003, and was home[1] all day except when he walked next door for fifteen to twenty minutes to get some nails from his neighbor (Doc. 12, Tr. pp. 462-463).

Jimmy Arbogast, an investigator employed by the LaSalle Parish Sheriff's Office, testified that, after Eddie was arrested, his residence was searched and picture of Eddie and Billy together was seized, as well as a Wal Mart receipt dated July 23, 2003 at 1:41 p.m. (Doc. 12, Tr. pp. 467-468, p. 297). Arbogast further testified the robbery had taken place on July 23, 2003 at 12:15 p.m. (Doc. 12, Tr. p. 472). The bank teller who was robbed

---

[1] Eddie lived with his mother and stepfather, Leslie Wilson.

11

identified Billy Robinson as one of the robbers from the photograph of Billy and Eddie; the identification was based in part on the fact that Billy's hair was in beaded corn rows and in part on his body-build (Doc. 12, Tr. p. 469). As a result of this evidence, the investigators were able to add Billy Robinson to their suspect list (Doc. 12, Tr. p. 471). Investigator Arbogast further testified that Billy Robinson gave a statement in which he denied going to Wal Mart or spending any money at Wal Mart on July 23, 2003 (Doc. 12, Tr. p. 472).

Laura Willis and Jana Hudson were employed as tellers at Homeland Bank in Jena, Louisiana on July 23, 2003 (Doc. 12, Tr. pp. 432, 440). Willis testified that, on July 23, at about 12:15 p.m., a black man with a stocking covering his head to below his nose entered the bank, aimed a gun at Hudson, told her to give him the money or he'd kill her, went around the counter, and took the money from her drawer, then pointed the gun in Willis's face window and took the money from her drawer (Doc. 12, Tr. pp. 433-434). Willis and Hudson testified they both had photocopied "bait money" in their drawers that could be traced in case of robbery (Doc. 12, Tr. pp. 434, 442). Willis further testified the robber was about 5'6" or 5'7", wore a white polo shirt with a pink band in the collar and jeans, and had white beads at the bottom of his hair (Doc. 12, Tr. p. 434). Hudson testified that a masked man entered the bank at about 12:15, pointed a pistol at her, told her to give him her

money, and took the money from her drawer (Doc. 12, Tr. pp. 440-441). Hudson testified the robber was a black male with a stocky build and a thick neck, his hair was in braids with beads on the ends, and he wore a white polo shirt with a pink stripe on the collar, blue jeans, tennis shoes, and a black mask (Doc. 13, Ex. p. 441).

Leslie Wilson testified that he lives with Eddie and Billy's mother, Inell Robinson (Doc. 12, Tr. p. 453). Wilson testified that Billy drove him to the bank in Jena on July 23, 2003, before 10 a.m., to cash his Social Security check (Doc. 12, Tr. p. 454). Wilson testified that he returned home before 10 a.m., Eddie was at home then, and they spent the rest of the morning at home (Doc. 12, Tr. p. 454). Wilson testified that he called Billy at about noon, or a little after, to take him to Wal Mart, Billy picked Wilson up sometime between noon and 1:00 p.m., and they were gone between 45 minutes and an hour; Billy had a photograph enlarged while they were at Wal-Mart (Doc. 12, Tr. pp. 455-456). Wilson testified that Eddie spent the entire day at home, except for the fifteen to twenty minutes he spent at a neighbor's house to borrow a hammer (Doc. 12, Tr. p. 455).

Cheryl Breland, a Wal Mart electronics department manager, testified that she was working at Wal Mart on July 23, 2003, and she made a picture for Billy Robinson (Doc. 12, Tr. p. 494). Breland identified the defendant in court and stated that, on July

23, 2003, Robinson wore his hair in dreadlocks with white beads on the ends (Doc. 12, Tr. p. 494). Breland testified that Robinson purchased a few items and paid with twenty dollar bills, which Amanda Smith, the Wal Mart cash officer, pulled from the register (Doc. 12, Tr. pp. 494-496).

Amanda Smith, the accounting officer at Wal Mart, testified she was working on July 23-24, 2003 (Doc. 12, Tr. p. 498). Smith further testified the LaSalle Parish Sheriff's Office provided her with a list of serial numbers for the bait money that was stolen from the bank in Jena, and was asked to check for bills that were on the bait list (Doc. 12, Tr. pp. 497-498). Smith found bills listed from the bait list that had been received at Wal Mart on July 23, 2003 (Doc. 12, Tr. p. 498).

### 3. Analysis

Billy Robinson contends that Eddie Robinson's testimony was key to the State's case. However, although Eddie was instrumental in leading the investigators to Billy Robinson, Eddie's testimony was not the only evidence against Billy. Although Billy denied, in his statement to the police, having gone to Wal Mart on July 23, 2003, Leslie Wilson testified that Billy drove Wilson to Wal Mart around noon on July 23, 2003, and that Defendant had a photograph enlarged while they were at Wal-Mart (Doc. 12, Tr. p. 390). Cheryl Breland testified that she assisted Billy Robinson with enlarging a photograph on July 23, 2003, and that he had dread locks in his

14

hair with "white on the ends of' em," and that he paid with twenty dollar bills. Laura Willis and Jana Hudson, employees of the bank that was robbed on July 23, 2003, testified that the robber was about 5'7" tall with stocky build and braids with white beads at the ends. Finally, Amanda Smith testified that bait money (twenty dollar bills) was found in the store on July 23, 2003.

Viewing the evidence in the light most favorable to the verdict, the evidence that Billy Robinson was at Wal Mart at 1:41 p.m. on July 23, 2003, spent bait money from the bank robbery there, and that he matched the bank employees' description of the robber, is sufficient to support Billy's conviction for armed robbery of the bank and negate any reasonable probability of misidentification. Therefore, Robinson's armed robbery conviction is supported by sufficient evidence.

Eddie Robinson's testimony, that Billy gave him the bait money Eddie spent at Wal Mart on July 24, 2003, simply reinforced the already-sufficient evidence against Billy Robinson. Billy Robinson has not shown that the reliability of Eddie's testimony was likely to have been determinative of Billy's guilt or innocence, or that there was a reasonable likelihood that Eddie's false testimony concerning his deal with the State could have affected the judgment of the jury. As stated above, there was sufficient evidence to support Billy Robinson's conviction without Eddie's testimony.

Therefore, Billy has not shown that Eddie's false testimony

15

was material, and has not carried his burden of proving he is entitled to a new trial. Likewise, Billy has not shown that he was actually prejudiced by his attorney's failure to cross-examine Eddie concerning his deal with the State in exchange for his testimony against Billy, so he has not proven he had ineffective assistance of counsel in this respect.

These grounds for relief are meritless.

<u>Remaining Ineffective Assistance of Counsel Claims</u>

Billy Robinson also argues his counsel was ineffective due to his failure to cross-examine Eddie Robinson as to his whereabouts at the time of the bank robbery, and his failure to subpoena Wal-Mart employee Tina Spears to testify as to the statement she gave to police concerning Eddie Robinson's hairstyle.

Billy is mistaken; his defense counsel did cross-examine Eddie Robinson as to his whereabouts at the time of the bank robbery (Doc. 12, Tr. pp. 462-463). Also, Leslie Wilson's testimony confirmed that Eddie was at home the morning of July 23, 2003, except for the fifteen to twenty minutes he was next door to get some nails, and defense counsel cross-examined Wilson about his testimony (Doc. 12, Tr. p. 456). Therefore, Billy Robinson has not shown prejudice and has not proven he had ineffective assistance of counsel on this claim.

Billy Robinson also contends that, had his attorney called Tina Spears, a Wal Mart employee, to testify, she would have

testified that she relieved Christa Poole, the customer service manager, for lunch at the customer service desk on July 24, 2003, and saw Eddie Robinson there on July 24, 2003. Billy contends that Spears could have verified that Eddie Robinson also wore his hair in corn rows, as she had stated to Detective Husbands (Doc. 12, Tr. pp. 190-191).

Complaints of uncalled witnesses are not favored because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative. Graves v. Cockrell, 351 F.3d 143, 155 (5th Cir. 2003), amended in other part, 351 F.3d 156 (5th Cir. 2003), cert. den., 124 S.Ct. 2160 (U.S. 2004), citing Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978). Also, Boyd v. Estelle, 662 F.2d 388, 390 (5th Cir. 1981). Unless a petitioner provides the court with affidavits (or similar matter) from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice. Sayre v. Anderson, 238 F.3d 631, 636 (5th Cir. 2001).

In her statement to the police, which is in the state court record, Spears stated that Eddie Robinson had his hair in corn rows when he approached the customer service desk at Wal Mart on July 24, 2003. However, Spears did not mention white beads in his hair. All of the evidence of record shows that the bank robber had white beads in his hair, and so did Billy Robinson when he visited Wal

Mart at 1:41 p.m. on July 23, 2003, spoke to Cheryl Breland and spent bait money. Since it does not appear that Spears' testimony was favorable since would not have helped Billy Robinson prove his brother, Eddie, was actually the bank robber, Billy has not shown his attorney was ineffective in this respect, either.

This ground for relief is also meritless.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Billy Robinson's Section 2254 habeas petition be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 2(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy of any objections or response to the District Judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.** *See*

*Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Pursuant to Rule 11(a) of the Rules Governing Section 2254 cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** *See* 28 U.S.C. § 2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 3rd day of August, 2011.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE